(25 Misc. Rep. 432.)

## In re CURREN.

(Supreme Court, Special Term, Kings County. December, 1898.)

1. TAXATION—POWER OF LEGISLATURE.

Taxation whether local or general is in all of its forms and details a legislative matter, and within the province of the legislature. Instead of delegating the doing of such details to boards or officials in the process of taxation, the legislature may do them itself.

**2. Due Process of Law—Legislative Proceedings.**

   The constitutional requirement of due process of law by means of due notice to those whose individual property rights are to be directly affected. has no application to the legislature acting within legislative province. but on the contrary every one is deemed to be present in the legislature and participating in all of its acts, either personally or by representation.

**3. Same—Judicial Proceedings.**

   The requirement of due process of law applies to the judicial department of government only, and such department embraces for the time being every board or official to whom the legislature has delegated the doing of anything which requires the exercise of discretion and judgment of a judicial nature, and directly affects individual property rights, even though it be within the province of the legislature to do itself the thing so delegated.

This is an application of Vincent Curren for a writ of mandamus against John Gilfoyle, as commissioner of buildings of the city of New York for the borough of Brooklyn, to compel him to approve the plans filed in his office by the petitioner for a building to be erected upon 4th place in the said borough, on the space inside of the sidewalk which is designated as court yard in the statutes under which the said street was laid out and opened in 1853. The said street has been built upon heretofore in conformity with such court yard, and is nearly all so built upon. Motion denied.

John J. Leary, for petitioner.

W. C. Courtney, for respondent.

GAYNOR, J. Section 3 of chapter 248 of the Laws of 1846 authorized the city "to take and appropriate" four pieces of land "of the width of fifty feet" each, running from Clinton street east to Smith street, for the purpose of four public streets to be called 1st, 2nd, 3rd, and 4th places. It located the "northerly side or line" of the said 1st place as distant 233 feet $5\frac{1}{4}$ inches southerly from the southerly side or line of Carroll street, and the northerly side or line of each of the said proposed streets in regular order from 1st place as 266 feet $10\frac{1}{2}$ inches from the southerly side or line of the preceding one. These measurements are to and from the 50-foot strip in each case, and bound it. It then provided that the carriageways should be 24 feet wide and the sidewalks 13 feet wide; and ends with a provision that the buildings to be erected upon the lots fronting upon the said streets "shall be built on a line 33 feet $5\frac{1}{4}$ inches back from the sides or lines of said places. and the intervening space of land shall be used for court yards only."

Under this act the property owners on 4th place petitioned the mayor and common council on May 12, 1849, that it be opened. Proceedings to open it were then begun under the governing act of the former village of Brooklyn (chapter 319 of the Laws of 1833. amended by chapter 156 of the Laws of 1838), as authorized by section 72 of the city charter (chapter 92 of the Laws of 1834). The common council fixed the district of assessment for the opening of the said street as extending one-half the block on each side. In the petition of the mayor and common council to the county court for the appointment of commissioners of estimate and assessment

for the opening, and in the order of the said court appointing them, the said 50-foot strip is described by metes and bounds as the land to be taken for the street. The reference in such description to an act passed May 12, 1849, is erroneous, the act being not of that year, but the act of 1846, above mentioned. This order of court is dated November 14, 1849. The commissioners published a notice dated November 20, 1849, of a hearing for November 30, 1849.

The next thing in chronological order is act chapter 376 of the Laws of 1850. Section 2 purports to amend the said section 3 of the act of 1846 by substituting "one hundred and sixteen feet ten and one-half inches" instead of "fifty feet" for the width of the said streets. But it does not change the distances given in the act of 1846, or in any way locate the sides or lines of the streets as changed. It may be for this reason, or because the said amending section was deemed unconstitutional, in that the subject of it was not expressed in the title of the act, that nothing was done under the said section.

Next, chronologically, comes act chapter 293 of the Laws of 1852. Section 3 makes each street 116 feet 10½ inches in width, by adding 33 feet 5¼ inches to each side of the said original 50-foot strip, as the distances given by it show. This reduced the block between each of the said proposed streets from 266 feet 10½ inches to 200 feet, and from Carroll street to 1st place from 233 feet 5¼ inches to 200 feet. And then this section ends as follows: "The proceedings heretofore commenced and now pending to open said Fourth street [meaning place] shall be continued and shall be deemed to apply to the said Fourth place as its lines are modified by this act."

And now the said commissioners of estimate and assessment, who had remained idle so far as the record discloses from the publication in 1849 of their said notice of hearing, again published a notice of hearing in the same words and entitled the same as the said former one. It is dated June 18, 1852, and names June 29, 1852, as the day of hearing. It is that "the commissioners of estimate and assessment in relation to the above improvement" will meet "to hear the proofs and allegations of all parties interested in said improvement." It gives no notice of the change of width of the street from 50 feet to 116 feet 10½ inches, or that they propose to take the latter width of land instead of the former, or any right or easement other than in the original 50-foot strip.

Next comes the publication of a notice by the said commissioners dated January 25, 1853, of the completion of their report and of a hearing before them thereunder for the review thereof, and then the publication of a notice dated February 19, 1853, of the filing of such report and of an application by the common council to the county court for confirmation thereof; and finally the order of the county court dated March 14, 1853, confirming the same.

In no part of the record is any change from the original 50-foot strip revealed, except in the said report of the commissioners, including the map which forms part of it. It shows that the said width of 116 feet 10½ inches, located by the said act of 1852, was taken and opened. It shows awards by numbered lots for all of the land in the said width,

and the assessments as cast within the assessment district. It does not show anything in respect of the width of roadway, sidewalks or court yards, or make any reference thereto.

Recapitulating the essentials, the case is disposed of as follows, viz.:

1. The act of 1846 authorized the taking of only the 50-foot strip for a street. The provision therein that buildings should be built 33 feet 5¼ inches back from such street, and that the intervening space should be used for court yards only, was unconstitutional and void, in that it did not provide for the taking of such an easement and for compensation to the land owners therefor. That act cannot therefore uphold the report of the commissioners opening a street 116 feet 10½ inches wide. The proceeding instituted in 1849 under the said act of 1846 was and could be to take and open such 50-foot strip only, and the commissioners of estimate and assessment were appointed therein for that purpose only.

2. As section 2 of the act of 1850 purported to change the width of each of the four proposed streets to 116 feet 10½ inches, but left the distances given in the act of 1846 unchanged, beginning at Carroll street, and so on, its effect was to add 66 feet and 10½ inches to the southerly side of each original 50-foot strip. No such street was ever laid out, and nothing was done under the said section, which was also possibly unconstitutional, as has already been mentioned.

3. The act of 1852 added 33 feet 5¼ inches to each side of the original 50-foot strips of the four streets, thus making a width of 116 feet 10½ inches. This act does not mention court yards, but as it is pari materia with the act of 1846, it must be construed with it, and thus construed it shows the final legislative intention to be streets with 24-foot roadways, 13-foot sidewalks, and 33 foot 5¼ inch court yards. Under it only, could a width of 116 feet 10½ inches be taken for the street in question, as the act of 1846 did not provide for a street of that width, as has been seen.

4. The final test comes upon the provision in the said act of 1852, that the said proceeding which had been instituted in 1849 for the opening of the street in question, and was still pending, "shall be continued, and shall be deemed to apply to the said Fourth place as its lines are modified by this act." Was it within legislative power to thus enlarge the scope of that proceeding, as begun and fixed under the act of 1846? It seems to me that it was. The constitutional provision that the compensation to be paid for private property taken for public use, when such compensation is not to be made by the state, shall be ascertained by a jury or by not less than three commissioners appointed by a court of record, was then in existence, having been enacted for the first time in the constitution of 1846. Except for this the legislature could appoint the commissioners, and its continuance of them in the proceeding as enlarged could be deemed equivalent to an appointment. But though the legislature could not appoint the commissioners, I see nothing in the way of its adding to their power to the extent it did after their appointment by the county court. I suppose, for instance, that in the case of such commissioners appointed under a statute allowing an easement to be taken, the legislature could enact that the fee be taken, and empower them to continue and ascertain the compen-

sation therefor. It would be germane and incidental to their duties under their appointment; and that is true of the present case. This out of the way, I see no difficulty in the matter of the constitutional requirement of due process of law, in respect of the changes made by the said act of 1852. Taxation in all its forms is a legislative matter. It would savor of pedantry to cite authority for this. It is within the province of the legislature to take unto itself and carry out without any aid, either administrative or judicial, the whole process and detail of taxation, local or general. The details which it usually delegates to subordinate boards and officers, it can, if it chooses, carry out itself with the aid of its own committees. If it delegates the doing of them, the requirement of due process of law applies to the board or officials to whom such delegation is made, in all respects in which their action is to directly affect individual property rights, and requires the exercise of judgment and discretion of a judicial nature. Due process of law requires that a hearing or an opportunity to be heard be given by means of due notice by such board or officials before they exercise such judgment and discretion, to the persons whose property rights are to be so affected. But this doctrine of due process of law has no application whatever to the legislature. It applies only to the judicial department of government, which embraces for the time being every official to whom the doing of any act of a judicial nature is entrusted by the legislature, though the legislature might legislatively do such act itself. Every individual is present in the legislature either actually or through his representative, and is a participant in all that is done there. The judicial doctrine of due process of law by means of due notice is inconsistent with and inapplicable to the legislative theory and system, under which all the people meet in legislative assembly either in person or by representative. That which is within legislative province the legislature may do without notice to any one, and taxation in all its forms and details is within such province. But if, to repeat, it delegate to a board or official the doing of any detail therein requiring the exercise of judgment and discretion of a judicial nature, and directly affecting individual property rights, such board or official may proceed only according to due process of law. Those decisions which seem sometimes to be understood as proceeding upon the supposition that the doctrine of due process of law can apply to legislative action must be misunderstood. The decision in the Van Antwerp Case, 56 N. Y. 261, marks the distinction. There the apportionment and assessments cast by commissioners in a district of assessment for a street improvement were found to be void, for the reason that the entire proceeding was void ab initio. Thereupon the legislature did what it might have done originally, instead of delegating the doing of it, viz., by an act it apportioned and cast the assessments itself. What it had power to do at first, it had power to do afterwards. I am not able to believe that the decision in the Union College Case, 129 N. Y. 308, 29 N. E. 460, was intended to declare anything different. The legislature could have apportioned and cast the water tax there in question originally. Was it not still competent to do so after it was found that the levy by the local officials was void? If not, why? I understand the decision of the court to be based upon the proposition that the act by

which the legislature sought to so apportion and cast the tax, fell short of doing it, for the reason that instead of directly doing it, it only assumed to ratify the void official acts previously done. It was not held that the legislature had not the power to pass an act apportioning and casting the tax, but that the act passed by it did not do so. In the Van Antwerp Case, the act there in question was construed to have apportioned and cast the tax; and this is the distinction between the two decisions.

5. It was not necessary for the commissioners to give notice of the change in the law under which they were acting. The new statute was itself notice and knowledge to everyone of what the commissioners were going to do. And, finally, the said notice of hearing upon their report given by the commissioners was required by the statute (section 7, Act 1833, supra), and therefore fulfilled the constitutional requirement of due notice.

The motion is denied.